UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Laurie Prince

        v.                          Civil No. 08-cv-471-JL
                                    Opinion No. 2010 DNH 046
Metropolitan Life Insurance Co.
and Verizon Communications, Inc.


### OPINION & ORDER

This case presents an employee's claim for disability benefits due to ear pain and other symptoms that she attributes to fibromyalgia, chronic pain syndrome, and depression. Plaintiff Laurie Prince brought suit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., against her former employer, Verizon Communications, Inc., and its claims administrator, Metropolitan Life Insurance Co. ("MetLife"), both of which had denied her disability claim. She asks this court either to overrule them and award her benefits under Verizon's disability plan, see id. § 1132(a)(1)(B) (authorizing civil actions "to recover benefits due" under an ERISA plan), or else to remand the case for reconsideration in light of a medical report issued shortly after her claim was denied. The defendants argue that they were justified in making a decision based solely on the record before them at the time, which in their view failed to establish that Prince was disabled from performing her job. This court has subject-matter

jurisdiction under 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) (ERISA).

Both sides have moved for judgment on the administrative record, see L.R. 9.4(c), and have summarized it in a joint statement of material facts, see L.R. 9.4(b).  After oral argument and a careful review of the record, judgment is granted to the defendants.  Even assuming that Prince suffers from fibromyalgia, chronic pain syndrome, and depression (despite the lack of a clear consensus among her doctors as to those diagnoses), the record fails to show that her ear pain and other symptoms prevented her from working in a desk job.  The defendants did not abuse their discretion by denying her claim for disability benefits.  Nor were they required to reopen their decision based on the belated medical report that Prince submitted.

## I.  **Applicable legal standard**

The standard of review in an ERISA case differs from that in an ordinary civil case, where summary judgment is designed to screen out cases that raise no trialworthy issues.  See, e.g., Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005).  "In the ERISA context, summary judgment is merely a vehicle for deciding the case," in lieu of a trial.  Bard v.

Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006).  Rather
than consider affidavits and other evidence submitted by the
parties, the court reviews the denial of ERISA benefits based
"solely on the administrative record," and neither party is
entitled to factual inferences in its favor.  Id.  Thus, "in a
very real sense, the district court sits more as an appellate
tribunal than as a trial court" in deciding whether to uphold the
administrative decision.  Leahy v. Raytheon Co., 315 F.3d 11, 18
(1st Cir. 2002).

Where, as here, an ERISA benefits plan gives its
administrator discretion to decide whether an employee is
eligible for benefits,[1] "the administrator's decision must be
upheld unless it is arbitrary, capricious, or an abuse of
discretion."  Wright v. R.R. Donnelley & Sons Co. Group Benefits
Plan, 402 F.3d 67, 74 (1st Cir. 2005).  This standard is
"generous" to the administrator, but "is not a rubber stamp."
Wallace v. Johnson & Johnson, 585 F.3d 11, 15 (1st Cir. 2009).
The administrator's decision must be "reasoned and supported by
substantial evidence."  Medina v. Metro. Life Ins. Co., 588 F.3d
41, 45 (1st Cir. 2009).  "Evidence is substantial if it is
reasonably sufficient to support a conclusion."  Stamp v. Metro.

---

[1]Both parties agree that Verizon has discretion under its
disability plan to determine an employee's eligibility for
benefits.

Life Ins. Co., 531 F.3d 84, 87 (1st Cir. 2008).  "Evidence contrary to an administrator's decision does not make the decision unreasonable, provided substantial evidence supports the decision."  Wright, 402 F.3d at 74.

Prince argues that this court should instead review the case de novo because Verizon has a structural conflict of interest. It is true that such a conflict exists:  Verizon has a self-funded disability plan under which it bears responsibility both for determining an employee's eligibility for benefits and for paying any benefits awarded.  But as our court of appeals recently explained, "the presence of a conflict of interest does not change the standard of review."  Cusson v. Liberty Life Assurance Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010); see also Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1, 9 (1st Cir. 2009).  Rather, the "conflict should 'be weighed as a factor in determining whether there is an abuse of discretion,'" alongside any other relevant factors.  Cusson, 592 F.3d at 224 (quoting Metro. Life Ins. Co. v. Glenn, 128 S. Ct. 2343, 2350 (2008)).

To determine how much weight to give the conflict, this court is "duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the [conflict's] potentially pernicious effects."  Denmark, 566 F.3d at 9.  Here, Verizon took a number of

4

insulating steps.  Most notably, it delegated to two outside insurance companies (Aetna Life Insurance Co. and MetLife) the authority for making the initial benefits determination and hearing Prince's first-level administrative appeal, respectively. Only at the second and final appeals stage did Verizon (through its claims review committee) become involved in reviewing the denial of Prince's claim.  Courts have consistently held that conflicts should be given less weight where the administrator has "added the intercession of an independent claims administrator" at those early stages of review.  Krensavage v. Bayer Corp., 314 Fed. Appx. 421, 425 (3d Cir. 2008); see also Neal v. Christopher & Banks Comprehensive Major Med. Plan, 651 F. Supp. 2d 890, 906-07 (E.D. Wis. 2009); Dunn v. Reed Group, Inc., No. 08-1632, 2009 WL 2848662, at *9 (D.N.J. Sept. 2, 2009); Wattenhofer v. Target Corp., No. 07-4116, 2009 WL 3242025, at *3 (D. Minn. Oct. 2, 2009); Russell v. Alcoa, Inc., No. 06-1459, 2008 WL 906448, at *8 (M.D. Pa. Mar. 31, 2008).

Prince, who "bears the burden of showing that the conflict influenced Liberty's decision," Cusson, 592 F.3d at 225, points to Verizon's refusal to consider a medical report that she submitted shortly after the final administrative decision.  She characterizes this refusal as "procedural unreasonableness," which the Supreme Court has said can "justif[y] the court in giving more weight to the conflict."  Glenn, 128 S. Ct. at 2352.

But as explained in Part III, _infra_, there was nothing unreasonable or improper about Verizon's refusal to consider that belated medical report.  Nor has Prince shown that the conflict played any role in it.[2]  Accordingly, this court will "not accord any special weight to the conflict in [its] analysis of whether [Verizon's] decision was proper, but rather consider[s] it along with all of the factors present in this case to determine if [Verizon's] ultimate conclusion regarding [Prince's] benefits was reasoned and supported by substantial evidence."  Cusson, 592 F.3d at 228 (quotation omitted).

## II.  **Background**

For more than twenty years, Prince worked for Verizon and its predecessor companies as a central office technician, a sedentary desk job that involves significant computer and telephone use.  Her work, according to performance reviews, was "top notch."  As a Verizon employee, she was eligible to participate in the company's self-funded Sickness and Accident Disability Benefit Plan for New England Associates (the "Plan"), which provides up to one year of sickness disability benefits to eligible employees who suffer a sickness or an off-duty injury

---

[2]Prince's attempt to show an actual conflict is further undermined by the fact that Verizon awarded her disability benefits in connection with two earlier disability claims.  See _infra_, Part II.

that prevents them from working for more than seven calendar days.  To receive benefits, an employee must be certified as disabled by the Plan's claims administrator.  Both parties agree that, at least for purposes of this case, disability means a sickness or injury that prevents the employee from performing her own job.[3]

Prince first made a claim for sickness disability benefits in August 2002 after falling off a stool and suffering a painful shin contusion.  Although she did not break any bones and medical providers could find "[n]o apparent reason for this persistent pain," Prince stayed out of work for more than two weeks.  During that time, she also went to the emergency room for a separate problem with her left ear, in which she had a long history of infections and chronic pain.  The pain, she said, had become worse and more constant in recent weeks, even causing her to faint.  The doctor saw a slight redness and bulging in her ear and diagnosed her with another ear infection.  He prescribed both an antibiotic and a pain reliever.

---

[3]The Plan is not entirely clear on that point and arguably sets a higher threshold -- i.e., "sickness or injury [that] prevents you from engaging in any occupation or employment for which you are qualified or may reasonably become qualified based on training, education or experience."  But because neither party argues for the "any job" definition, this court will apply the "own job" definition, which is more favorable to Prince.

By early September 2002, Prince's shin had fully recovered, but the pain in her left ear persisted.  As a result, she stopped going to work again in mid-September and, about a week later, filed another sickness disability claim.  Her primary care physician, Dr. Colleen Guiry, evaluated her a number of times during this period.  Concluding that Prince's "pain seems to be out of proportion to the objective signs," Dr. Guiry referred her to an ear specialist, Dr. Richard Lee, and ordered an MRI, which revealed nothing that would explain the ear pain.  Dr. Guiry also prescribed another course of pain medication.

Dr. Lee, the ear specialist, examined Prince in mid-September 2002, but could not find anything wrong with her ear. He also ordered some laboratory tests, which came back negative. As a result, he wrote to Dr. Guiry that he had "no diagnosis to treat [Prince] with any pain medication at this point in time." But he suggested that Prince's pain could be attributable to a jaw problem (i.e., temporomandibular joint disorder, commonly known as TMJ) or "possible psychological pain, with possible secondary gain."  Secondary gain refers to "support, attention, avoidance of unpleasant responsibilities," and other advantages that can be gained from an illness.  Dorland's Illustrated Medical Dictionary 556 (31st ed. 2007)).  Prince then arranged to see another specialist, Dr. Douglas Bell, who had performed sinus surgery on her many years earlier.  There is no medical report in

8

the record from that visit, but Dr. Bell apparently diagnosed her
with neuralgia (i.e., nerve pain, <u>see</u> <u>id.</u> at 1281), referred her
to a neurologist, and filled out forms excusing her absence from
work.

In early October 2002, still out from work, Prince underwent
a neurological evaluation by Dr. William House.  Dr. House noted
that she claimed to be "in agonizing pain but does not look to be
in pain at all."  Like Dr. Lee, Dr. House could not make a clear
diagnosis, but identified a number of possibilities, including
neuralgia, TMJ, and psychological pain.  He gave Prince a local
anesthetic for her ear pain and also prescribed a steroid and
muscle relaxant, while suggesting that Prince wean herself off
pain relievers, which he suspected might be causing her fatigue.
And he "strongly encouraged her to get back to work as soon as
possible."  Prince asked if she could put off work until the next
Monday (it was a Wednesday), but he told her "the sooner . . .
the better."

Prince did not return to work as Dr. House suggested.
Instead, she went back to her primary care physician, Dr. Guiry,
in late October 2002.  After discussing Prince's visits with the
other doctors, Dr. Guiry prescribed a nerve pain medication
(Neurontin) for "presumed neuralgia" and, contrary to Dr. House's
assessment, reported that Prince had been unable to perform her
job since mid-September because of ear pain.  At a follow-up

visit in mid-November 2002, however, Dr. Guiry echoed Dr. House and "strongly encouraged [Prince] to go back to work," if only for half-days, because "staying at home . . . is not particularly conducive to decreasing her ear pain."  This time, Prince followed the doctor's advice and returned to work the next Monday, after the Thanksgiving holiday.

After four half-days back on the job, Prince made another claim for sickness disability benefits in early December 2002-- the disability claim at issue in this case.  She reported to Aetna, the Plan's claims administrator, that she had stopped working because of neuralgia, head pain, and fatigue.  She also claimed to be experiencing dizziness and double vision.  Dr. Guiry, who had not seen Prince since advising her to go back to work in mid-November, submitted a form to Aetna confirming that Prince was unable to work because of dizziness, double vision, and fatigue, describing them as "side effects of Neurontin, which has helped with [her ear] pain."

Despite having approved Prince's previous two disability claims, Aetna denied the third one because, in its view, Prince had not presented any medical evidence that she was unable to continue performing her desk job.  Prince had 180 days to challenge that decision by filing an administrative appeal.  She chose not to do so right away.  Instead, she continued seeking treatment and submitting her medical records to Aetna in the hope

that it would reverse its decision without requiring an appeal. In the meantime, because she refused to return to work, Verizon sent Prince a letter terminating her employment. She never worked for the company again.

Prince went to see another neurologist, Dr. Keith McAvoy, in January 2003 (and regularly thereafter). He, too, could not identify a "definitive cause" for Prince's ear pain, but agreed with Drs. House and Bell that she "could be dealing with a neuralgia," albeit with somewhat unusual symptoms.[4]  He also diagnosed her with "atypical" depression and anxiety disorder and noted that she could be experiencing "anxiety converted to neurological symptoms." He ordered some laboratory tests to probe for other possible diagnoses, but they came back negative. Based on his evaluation, Dr. McAvoy reported to Aetna that Prince had no functional limitations other than head pain. Nevertheless, he felt that she should be "kept out of work indefinitely until her chronic painful symptoms are alleviated and her depression [is] under improved control." Aetna reviewed the new information and deemed it insufficient to warrant reversal of its earlier decision.

---

[4]Prince confirmed to Dr. McAvoy that the Neurontin had made a "drastic difference" for her ear pain, which "had gotten much better," but that she had developed various other symptoms, including dizziness and double vision. Dr. McAvoy agreed that those were probably side effects of Neurontin and recommended that Prince switch to another medication, which seemed to help.

Dr. McAvoy referred Prince to a psychiatrist, Dr. Jory
Goodman, "to help [her] deal with her depression and anxiety
related to her chronic pain."  Dr. Goodman evaluated Prince in
March 2003.  After discussing Prince's medical history, Dr.
Goodman came to "suspect very strongly" that Prince had sustained
an undiagnosed skull fracture in early 1999 when she fell from a
horse onto frozen ground, which resulted in "episodic and
recurrent fluid leaking from her ear" over the ensuing years.[5]
Dr. Goodman considered it possible that fluid had built up in
Prince's ear canals, thereby causing pressure and pain, but was
"not aware of any good technique to measure" it.  (Dr. Guiry
later noted, however, that Prince's "symptoms of pain are not
typical of this particular entity.")  Like Dr. McAvoy, Dr.
Goodman also raised the "possibility of somatization"--i.e., the
conversion of mental states into bodily symptoms.  See Dorland,
supra, at 1759.  On balance, Dr. Goodman concluded that Prince
was "temporarily totally disabled" by "neuralgia as well as her
present mood and pain disorder."  He continued to hold that
opinion after subsequent visits.

When Prince saw Dr. McAvoy again in May 2003, she described
"some new symptoms:"  radiating pain in the back of her head,

_____

[5]When Prince fell from the horse, her back hit the ground
first, followed by her head, which was protected by a helmet.
Records of her treatment after the fall focus on her back injury,
not a head injury.

behind her left ear, accompanied by occasional twitching in her extremities.  Prince told Dr. McAvoy about the fall from the horse in 1999, as well as another incident in 1996 where she fell on black ice and hurt her head.  Dr. McAvoy diagnosed her with "probable musculoskeletal pain," which he thought could be contributing to her "possible atypical neuralgia involving the left ear."  He tried a local anesthetic to reduce her pain, but "only got a very limited response."  As for the twitching, Dr. McAvoy attributed it to Prince's medication.

Around that time, Prince filed an administrative appeal challenging Aetna's denial of her disability claim.  In early June 2003, MetLife--which had replaced Aetna as the Plan's claims administrator--rejected her appeal, upholding Aetna's decision. "It is clear that [Prince] has complaints of ongoing pain," concluded MetLife's reviewing doctor Janet St. Claire, but "the medical [information] that was provided does not substantiate her inability to perform [a] sedentary job" or even "indicate [her] degree of pain."  MetLife's decision left Prince with only one more administrative remedy under the Plan:  a second and final appeal to Verizon.

Before filing such an appeal, Prince continued to seek medical treatment.  Another neurologist, Dr. Jeffrey Rind, evaluated her in mid-June 2003.  While acknowledging that "other doctors have suggested this is probably a neuralgia" case, Dr.

13

Rind found it "difficult to explain [Prince's] ear discomfort and pain," or "where her head pain is."  He noted that there "certainly could be some symptom exaggeration although I think this is less likely."  He suggested that Prince, who had a long history of lower back pain (even before she fell from the horse), might be suffering from spine disease.  To test that theory, Prince went to see a neurosurgeon, Dr. Theodore Jacobs, for a spine evaluation.  Dr. Jacobs concluded that Prince's spine was indeed impinging on her nerve roots, but that "her symptoms do not correlate" with a nerve root problem, and she "more likely" had some sort of muscular or soft tissue problem.

Prince went to see her primary care physician, Dr. Guiry, again in July and August 2003 and reported having "aches all over," including but not limited to left ear pain, head and neck pain, and a recurrence of back pain from her fall off the horse. Prince explained that her head pain had worsened as her ear pain improved, and she predicted that "if and when her head and neck pain are dealt with, the ear pain may become more of a problem again."  Dr. Guiry concluded that Prince "has now developed chronic severe pain syndrome" and prescribed a trial of morphine. That proved to be too potent, however, causing Prince to act "strangely" and resulting in a trip to the emergency room, where she was diagnosed with a drug overdose.  So Dr. Guiry switched Prince to a less potent pain reliever.  Dr. Guiry also ordered

14

another MRI, which again revealed nothing that would explain
Prince's symptoms.

Prince retained counsel in August 2003 to represent her in
the final administrative appeal to Verizon.  To support the
appeal, her counsel submitted hundreds of pages of medical
records and explained that Prince "continues to have significant
medical treatment relevant to her disability," which counsel
would be "regularly obtaining" and then "immediately" submitting
for review.  Her counsel specifically mentioned future
appointments with Dr. Guiry, Dr. McAvoy, and a new doctor,
psychologist Richard Berke.  In response, Verizon informed Prince
that once it received certain paperwork (i.e., her medical
release and designation of counsel), its review committee would
consider her appeal "at its next meeting, generally held every
four to six weeks."  Prince submitted that paperwork in mid-
September.  In addition, her counsel submitted another batch of
medical records in late September.  He noted in his cover letter
that Dr. Berke had begun testing Prince "but his computer broke
down and my client is still awaiting an updated appointment
date."

In early October 2003, Prince's counsel submitted two more
batches of medical records to Verizon, including an updated

report from Dr. McAvoy.[6]  Based on Prince's chronic and
increasingly widespread pain, Dr. McAvoy had concluded that she
was likely suffering from fibromyalgia, which is a disease
"characterized by chronic and frequently difficult to manage pain
in muscles and soft tissues surrounding joints."  Cusson, 592
F.3d at 218 (citing Taber's Cyclopedic Medical Dictionary 402
(19th ed. 2001)).  He now considered it "doubtful" that Prince
"has any particular neurological problem" of the sort that he had
previously suspected.  Still, Dr. McAvoy "did not feel that
[Prince] was capable of being gainfully employed with her current
symptoms."  Prince's counsel highlighted that statement in his
cover letter to Verizon and expressly "confirm[ed] that it is our
intention for [Prince's] claim to be decided at the [review
committee's next] meeting on October 16, 2003."  The letter said
nothing about the status of Dr. Berke's testing.

Verizon reviewed and rejected Prince's final administrative
appeal on October 21, 2003, "due to a lack of medical evidence to
substantiate a total disability from her own occupation."  Dr.
Rukhsana Sadiqali, who analyzed Prince's medical records on
behalf of the review committee, concluded that Prince "continues
to complain of excruciating pain in her left ear and back of her

_____

[6]Also included were some hearing test results, which
indicated that Prince had normal hearing in her right ear, some
"mild to moderate" high-frequency hearing loss in her left ear,
and good speech discrimination in both ears.

head," but "the documentation submitted has failed to support any
significant limitation, deficits, or impairment that would
prevent [her] from performing her occupation."  On October 28,
2003, Prince received a letter from Verizon explaining its
final decision.

Nearly a month later, Prince's counsel requested that the
Verizon reconsider its decision in light of a "significant new
medical document" from Dr. Berke, which had been issued on
November 10, 2003.  Dr. Berke noted that Prince "reports falling
from a horse [in] 1999, and suffering . . . from a traumatic
brain injury, aggravated by fibromyalgia and major depression."
Based on his own multi-day assessment, Dr. Berke concluded that
Prince suffered from a "general loss of cognitive functioning and
proficiency, with severe cognitive slowing," as well as
"delusions and/or hallucinations" (including a belief "that she
has special mystical powers").  He stated that "it would be
impossible for [Prince] to function effectively in a pressured
atmosphere with novel tasks, loud noise, and interruptions."
Verizon declined, however, to reopen its decision in light of Dr.
Berke's report and appears not to have responded to the letter
from Prince's counsel.[7]

_____

[7]At some point, Prince received a favorable decision from
the Social Security Administration (SSA) awarding her full
disability benefits retroactive to March 2003.  Since it is not
clear if that happened before Verizon's decision, and since the

17

Prince brought an ERISA action against Verizon and MetLife
in this court nearly three years later, challenging their denial
of disability benefits.  See Scoville v. Metro. Life Ins. Co. and
Verizon Commc'ns, Inc., No. 06-cv-405-PB (D.N.H. Oct. 27, 2006).[8]
But the court dismissed her case without prejudice in November
2007 for failure to comply with the local rules governing ERISA
cases.  See L.R. 9.4.  Within a year of that dismissal, Prince
re-filed the action with new counsel.[9]  This time, she has

---

SSA's decision is neither a part of the record nor mentioned in
Prince's motion for judgment, this court does not give it special
weight, but rather considers it as one of many relevant factors.
See Pari-Fasano v. ITT Hartford Life & Accident Ins. Co., 230
F.3d 415, 420 (1st Cir. 2000) (noting that SSA decisions "are not
binding" in ERISA cases and, while they "might be relevant,"
usually "should not be given controlling weight").

[8]Prince's last name used to be Scoville.

[9]The defendants argue that Prince's new action is barred by
the statute of limitations, but this court disagrees.  ERISA
"supplies no statute of limitations so federal courts borrow the
relevant statute of limitations from the forum state."  Island
View Residential Treatment Ctr. v. Blue Cross Blue Shield of
Mass., Inc., 548 F.3d 24, 27 (1st Cir. 2008).  Both parties agree
that the most relevant New Hampshire statute is N.H. Rev. Stat.
508:4, which requires that personal actions be brought within
three years.  See Lund v. Citizens Fin. Group, Inc., No. 97-cv-
183, 1999 WL 814341 (D.N.H. Sept. 30, 1999) (McAuliffe, D.J.).
When borrowing a state's statute of limitations under ERISA,
courts also typically borrow any savings statute that might
apply.  See, e.g., Preston v. John Alden Life Ins. Co., No. 1:05-
cv-173, 2006 WL 201076, *3 (S.D. Ohio July 17, 2006) (citing
Coleman v. Dep't of Rehab. & Corr., 46 Fed. Appx. 765, 769 (6th
Cir. 2002)); cf. Corliss v. City of Fall River, 397 F. Supp. 2d
260, 265 (D. Mass. 2005) (applying savings statute to 42 U.S.C.
§ 1983 claims, which also borrow the state limitations period).
Here, New Hampshire has a savings statute, N.H. Rev. Stat.
§ 508:10, that allows a plaintiff whose original, timely action

complied with the local rules, as have the defendants, by jointly filing a statement of material facts and each moving for judgment on the administrative record.  This court must therefore resolve her case on the merits.  Before doing so, however, the court must answer a threshold question about the scope of the administrative record:  whether it should include the post-denial medical report from Dr. Berke.[10]


## III.  Scope of administrative record

As a general rule, "the final administrative decision acts as a temporal cut off point" for the administrative record in an ERISA case.  Orndorf, 404 F.3d at 519; see also Lopes v. Metro. Life Ins. Co., 332 F.3d 1, 5-6 (1st Cir. 2003); Liston v. UNUM Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003). "The claimant may not come to a court and ask it to consider post-denial medical evidence in an effort to reopen the

---

is dismissed without prejudice (as Prince's was) to re-file it within one year of that dismissal, even if the limitations period otherwise would have expired.  Prince complied with the savings statute, so her action is not time-barred (except in one limited respect, discussed in Part III, infra).

[10]The parties briefed this issue separately earlier in the case.  This court allowed Prince to submit Dr. Berke's report as part of the administrative record, but did so "without prejudice to any present or renewed argument by the defendants that the court should not consider [the report] in its eventual ruling." Order dated Mar. 17, 2009.

administrative decision," because doing so would "shift the focus
from that decision to a moving target" and thereby "offend
interests in finality and exhaustion of administrative procedures
required by ERISA."  Orndorf, 404 F.3d at 519 (citing Liston, 330
F.3d at 24).  While this rule is not absolute, a "very good
reason is needed to overcome the strong presumption that the
record on review is limited to the record before the
administrator."  Liston, 330 F.3d at 23.

    Prince argues that Dr. Berke's medical report--although
issued about three weeks after Verizon's final decision--belongs
in the administrative record because Verizon knew "well in
advance" that Dr. Berke's testing was underway and nevertheless
"rushed to judgment" without waiting for his report.  But Prince
never asked Verizon to wait for Dr. Berke's report; to the
contrary, she urged it to make a decision as soon as possible.
In a letter sent to Verizon after advising it that Dr. Berke's
testing had been delayed by computer troubles, Prince's counsel
expressly "confirm[ed] that it is our intention for the claim to
be decided at the [review committee's next] meeting" in mid-
October 2003.  And so it was.  Given that context, this court has
no reason to believe that Verizon rushed to judgment in an effort
to pre-empt Dr. Berke's report.  Indeed, at the time of its
decision, Verizon had no idea whether Dr. Berke's report would be
favorable or unfavorable to Prince or when it would be finished.

Our court of appeals considered a similar issue in <u>Lopes</u>, 332 F.3d at 1.  There, the plaintiff filed an appeal with MetLife after his disability benefits were terminated.  In so doing, he "promised to submit additional medical information."  <u>Id.</u> at 3. MetLife denied his appeal less than two months later, explaining that "notwithstanding [the plaintiff's] promise to submit additional materials, 'there were no current medical records in file.'"  <u>Id.</u> at 3-4.  During litigation, the plaintiff asked that a doctor's affidavit and a medical note "written several weeks after MetLife's final determination" be added to the administrative record for purposes of judicial review.  <u>Id.</u> at 5. As in this case, the plaintiff colored his request with accusations of "improper motivation."  <u>Id.</u> at 4.  But the court of appeals refused to consider the extra materials, limiting its review to "the record available to the plan administrator" at the time of its decision.  <u>Id.</u> at 5.  If anything, this case presents a less difficult question than <u>Lopes</u>, because Prince expressly approved the timing of Verizon's decision and had already submitted plenty of current medical records.

Prince also argues that Verizon, even if justified in making a decision when it did, should have reconsidered that decision once she submitted Dr. Berke's report less than a month later. By that point, however, nearly a year had passed since Prince left work.  Her disability claim had been reviewed and rejected

21

three times by three different entities (Aetna, MetLife, and

Verizon) based on their review of voluminous medical records from

more than half a dozen doctors.  Moreover, the Plan made clear

that Verizon's decision "shall be the final, conclusive, and

binding administrative remedy under the Plan."[11]  Given the

"interests in finality and exhaustion of administrative

procedures required by ERISA," Orndorf, 404 F.3d at 519 (citing

---

[11]At oral argument, Prince's counsel argued for the first
time that the Plan required Verizon to consider Dr. Berke's
report because a January 2002 update to the Plan's summary
description provided that "Verizon will not review your matter
again [after the second appeal], unless new facts are presented."
(Emphasis added.)  Counsel admitted that he had not presented
that theory in his earlier filings.  This court generally will
not consider theories raised for the first time at oral argument,
out of fairness to adverse parties and the court.  See, e.g.,
Johnson v. Gen. Dynamics Info. Tech., Inc., --- F. Supp. 2d ---,
2009 DNH 194, at 8 n.9; Doe v. Friendfinder Network, Inc., 540 F.
Supp. 2d 288, 309 n.19 (D.N.H. 2008).  Because Prince easily
could have and should have made the argument earlier, this court
rejects it as untimely.
     Even if it were timely, however, Prince's argument would
fail on the merits.  Like the Plan itself, the summary
description expressly stated that the second appeal "is the
final, conclusive and binding administrative remedy."  Indeed,
ERISA regulations prohibit benefits plans from "requir[ing] a
claimant to file more than two appeals of an adverse benefit
determination."  29 C.F.R. § 2560.503-1; see also Menz v. Procter
& Gamble Health Care Plan, 520 F.3d 865, 869 (8th Cir. 2008).
Given that context, it would be unreasonable to interpret the
summary description's caveat about "new facts"--which is stated
negatively--as giving Prince an affirmative right to perpetual
review of new medical records.  Verizon clearly did not interpret
it that way, and as administrator Verizon has "discretion to
determine the intended meaning of the plan's terms."  Stamp, 531
F.3d at 93-94 (1st Cir. 2008).  On the facts of this case,
Verizon did not abuse its discretion in refusing to reopen its
final decision.

Liston, 330 F.3d at 24), this court cannot fault Verizon for standing by its decision and rejecting Prince's request for yet another layer of review.  See id. (refusing to consider belated medical evidence where "plaintiff had ample time to collect records and had two administrative appeals").

Prince seems to believe that Verizon rejected her request not because it was too late, but rather because Dr. Berke's report confirmed her disability and thus went against Verizon's financial self-interest.  But this court sees nothing in the record (or in Dr. Berke's report) to support that suspicion. Moreover, Prince overstates the significance of Dr. Berke's report.  Contrary to her assertion that Dr. Berke, a psychologist, "concluded Plaintiff was 'suffering sequela from a traumatic brain injury, aggravated by fibromyalgia and major depression,'" those were actually diagnoses that Prince herself reported to Dr. Berke as the findings of her medical doctors-- doctors whose reports Verizon already had.  While Dr. Berke certainly added some psychological findings of his own, including a diagnosis of cognitive slowing, other doctors had made contrary findings regarding Prince's cognitive status.  Thus, even if Dr. Berke's report were part of the record under review, it would not materially change this court's substantive analysis.  See, e.g., Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 31 n.6 (1st Cir. 2001) (deeming additional evidence "of no consequence"

to ERISA case because the result would have been the same either way).

Finally, Prince argues for the first time in her motion for judgment that Verizon's failure to consider Dr. Berke's report violated her right to a "full and fair review" under ERISA, which provides in relevant part:

> In accordance with regulations of the Secretary [of Labor], every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133(2); see also 29 C.F.R. § 2560.503-1 (implementing regulations).  This claim is untimely, however, because Prince failed to raise it not only in her complaint here, but also in her original ERISA action before Judge Barbadoro, upon which she relies as having tolled the statute of limitations under New Hampshire's savings statute.  See supra note 9 (discussing that issue).  As Prince's counsel acknowledged at oral argument, the savings statute generally does not apply to "a new legal claim based on the same facts alleged in the first lawsuit" but not raised until the second lawsuit.  Moulton-Garland v. Cabletron Sys., Inc., 143 N.H. 540, 543 (1999).  Thus, Prince cannot raise a § 1133(2) claim for the first time now, more than five years after Verizon's final decision.

Even if this claim were timely, however, it would fail on the merits.  Prince has not shown the sort of "procedural irregularity" or departure from "baseline procedural protections" that might call into question the fullness or fairness of Verizon's review.  See DiGregorio v. Hartford Comprehensive Employee Benefit Serv. Co., 423 F.3d 6, 14-16 (1st Cir. 2005). The regulations under § 1133(2) do require plan administrators to "take[] into account all comments, documents, records, and other information submitted by the claimant" on administrative appeal, 29 C.F.R. § 2560.503-1(h)(2)(iv), but that requirement does not apply to "additional medical evidence Plaintiff submitted after her appeal was denied and [the administrator's] decision was final."[12]  Miller v. Ameritech Long Term Disability Plan, 584 F. Supp. 2d 1106, 1119 (C.D. Ill. 2008) (emphasis added); see also

_____

[12]Prince also alleges that Verizon failed to consider a medical report that she submitted shortly before its decision: the one from Dr. McAvoy suggesting a "likely" diagnosis of fibromyalgia.  She notes that Dr. McAvoy's report is never expressly mentioned in Verizon's denial letter or internal reports.  But Verizon stated in the denial letter that it had analyzed "all of the information available," and the record strongly suggests that it considered Prince's final submissions as they came in.  Prince's counsel specifically highlighted Dr. McAvoy's findings in his final letter to the review committee. Under the circumstances, "it would be improper for the court automatically to assume that unless [Verizon] lists each item the examiner reviewed, he or she did not review it."  Cusson, 592 F.3d at 227 (citing Tsoulas v. Liberty Life Assurance Co., 454 F.3d 69, 77 (1st Cir. 2006)).  This court will, however, consider Dr. McAvoy's report in analyzing whether the defendants abused their discretion in denying Prince's disability claim.

<u>McElroy v. SmithKline Beecham Health & Welfare Benefits Trust</u>
<u>Plan</u>, 340 F.3d 139, 144 (3d Cir. 2003).

In sum, Prince has not offered a good enough reason "to
overcome the strong presumption that the record on review is
limited to the record before the administrator." <u>Liston</u>, 330
F.3d at 23.  This court therefore declines to consider Dr.
Berke's report in its substantive analysis of Prince's ERISA
claim, and likewise declines to remand the case to the defendants
for reconsideration in light of that report.


**IV.  <u>Analysis</u>**

ERISA is a statutory framework that "Congress enacted . . .
to protect the interests of participants in employee benefit
plans," <u>Johnson v. Watts Regulator Co.</u>, 63 F.3d 1129, 1132 (1st
Cir. 1995), and to "ensure that plans and plan sponsors would be
subject to a uniform body of benefits law."  <u>N.Y. State</u>
<u>Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.</u>
<u>Co.</u>, 514 U.S. 645, 656 (1995).  To promote those objectives,
ERISA provides that an employee who participates in an "employee
welfare benefit plan" (as defined in 29 U.S.C. § 1002(1)) may
bring a civil action against the plan's administrator "to recover
benefits due to [her] under the terms of [her] plan."  29 U.S.C.
§ 1132(a)(1)(B).  Here, both sides agree that Verizon's

disability plan qualifies as an employee welfare benefit plan covered by ERISA and that Prince was one of its participants. The relevant question, then, is whether § 1132(a)(1)(B) entitles Prince to recover disability benefits.

Turning now to the merits of the case, this court must decide whether the defendants abused their discretion by denying Prince's claim for sickness disability benefits under the Plan. Prince argues she is entitled to benefits because the medical evidence demonstrates that, beginning in December 2002, her ear pain and other symptoms prevented her from working.  The defendants, while acknowledging Prince's subjective reports of pain, nevertheless denied her benefits because, in their view, the medical evidence failed to establish that her pain truly prevented her from working in a desk job.  As explained above, see supra Part I, this court need not agree with that conclusion to uphold the denial.  The decision must be upheld so long as it was "reasoned and supported by substantial evidence."  Medina, 588 F.3d at 45.  This court concludes that it was and therefore grants judgment to the defendants.[13]

As an initial matter, Prince's counsel conceded at oral argument that Prince's doctors never reached a clear consensus

---

[13]Indeed, Prince's counsel conceded at oral argument that, unless Dr. Berke's report were added to the record, his client could not prevail under the abuse-of-discretion standard.

regarding the cause of her ear pain and other symptoms.  Their most common suggestion was "possible" neuralgia, but Prince's symptoms were not typical of that diagnosis, and some of her doctors doubted it.  One of them, Dr. McAvoy, came to believe as Prince's symptoms spread that she "likely" suffered from fibromyalgia.  Another doctor, Dr. Guiry, attributed the spreading symptoms to chronic pain syndrome.  Yet another doctor, Dr. Goodman, "suspect[ed] very strongly" that Prince suffered a brain injury after falling off a horse years earlier, resulting in fluid build-up and pressure inside her ear.  But Prince's symptoms were not typical of that diagnosis either, according to Dr. Guiry.  And finally, various doctors suggested that Prince might be suffering from physical manifestations of psychological pain, including depression (again called "atypical") and anxiety disorder.

Prince appears to believe that she suffers from an assortment of nearly all of these maladies, including fibromyalgia, chronic pain syndrome, and depression.  If she is right, then the lack of a clear consensus among her doctors is perhaps understandable.  As the court of appeals recently noted, "fibromyalgia is a disease that is diagnosed primarily based on a patient's self-reported pain symptoms" and "does not lend itself to objective verification."  Cusson, 592 F.3d at 227 (quoting Denmark v. Liberty Life Assurance Co., 481 F.3d 16, 37 (1st Cir.

2007), vacated on other grounds, 566 F.3d 1 (1st Cir. 2009)).
Moreover, the presence of other problems, such as chronic pain
syndrome and depression, could make diagnosis even more
difficult.  In any event, this court need not dwell too long on
Prince's proper diagnosis, because the critical issue here is not
whether the cause of her symptoms has been diagnosed with
absolute certainty, but rather whether her symptoms (whatever
their cause) prevented her from performing her job.

Our court of appeals has made clear that while conditions
like "fibromyalgia may not lend themselves to objective clinical
findings, the physical limitations imposed by the symptoms of
such illnesses do lend themselves to objective analysis."
Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 16 n.5 (1st
Cir. 2003) (citing Cook v. Liberty Life Assurance Co., 320 F.3d
11, 21 (1st Cir. 2003)).  Thus, "it is permissible to require
objective support that a claimant is unable to work as a result
of such conditions."  Desrosiers v. Hartford Life & Accident Ins.
Co., 515 F.3d 87, 93 (1st Cir. 2008); see also Cusson, 592 F.3d
at 227 ("requiring objective evidence that the plaintiff is
unable to work . . . is allowed") (quoting Denmark, 481 F.3d at
37).  Not everyone with such illnesses has been able to make the
requisite showing.  See, e.g., Richards v. Hewlett-Packard Corp.,
592 F.3d 232, 241 (1st Cir. 2010) (affirming termination of
disability benefits for patient with fibromyalgia and chronic

fatigue); <u>Cusson</u>, 592 F.3d at 215 (affirming termination of disability benefits for patient with fibromyalgia).

Here, the record casts serious doubt on whether Prince's ear pain and other symptoms prevented her from working in a desk job. Many of her doctors seemed to question (subtly or not so subtly) the intensity of her pain. Early on, Dr. Guiry commented that Prince's "pain seems to be out of proportion to the objective signs." Similarly, Dr. House commented that Prince claimed to be "in agonizing pain but does not look to be in pain at all" and "strongly encouraged her to get back to work." Later on, Dr. Rind also found it difficult to explain "where her head pain is" and suggested the possibility of "symptom exaggeration." Coming from Prince's own doctors, these comments (and others like them) lend substantial support to the defendants' decision to deny her disability claim. <u>See</u>, <u>e.g.</u>, <u>Gannon v. Metro. Life Ins. Co.</u>, 360 F.3d 211, 213 (1st Cir. 2004) (citing evidence of symptom exaggeration in upholding termination of disability benefits); <u>Matias-Correa v. Pfizer, Inc.</u>, 345 F.3d 7, 12 (1st Cir. 2003) (same).

Moreover, the record suggests that Prince had an almost <u>a priori</u> commitment to her disability claim. As her original symptoms changed and even improved (e.g., her ear pain "got[] much better," as apparently did her dizziness, double vision, and

30

fatigue), she inevitably reported new symptoms that took their place and thereby maintained her inability to work.  She even predicted at one point that "if and when her head and neck pain are dealt with, the ear pain may become more of a problem again." And at times, her new symptoms seemed to follow from her preferred diagnosis, rather than the other way around.  In particular, after Dr. Goodman suggested that Prince may have sustained a brain injury when she fell from a horse three years earlier, Prince soon began to emphasize neck and back pain and cognitive challenges, even more so than the original symptoms that had led her to stop working.  While certainly not dispositive, this circumstantial evidence lends further support to the defendants' decision.  Cf. Leahy, 315 F.3d at 19 (citing evidence of "highly suspicious" timing in upholding the denial of disability benefits).

    Prince stresses that some of her doctors expressly concluded she was unable to work (as did the Social Security Administration).  That is true, and indeed is the strongest evidence in her favor.  But such evidence is "by no means unassailable," particularly given that another doctor (Dr. House) expressly reached the opposite conclusion.  Gannon, 360 F.3d at 215 (upholding termination of disability benefits even though the claimant's doctors "consistently opined that [she] was unable to work").  As the Supreme Court has noted, "a treating physician,

31

in a close case, may favor a finding of 'disabled.'"   <u>Black &</u>
<u>Decker Disability Plan v. Nord</u>, 538 U.S. 822, 832 (2003).   That
appears to be what happened here.   The record suggests that
Prince's doctors essentially deferred to her subjective claims of
disability.[14]   They offered little, if any, specific explanation
for how Prince's symptoms would prevent her from performing her
job tasks.   And as her symptoms changed, they engaged in little,
if any, critical reassessment of her ability to work.   "[A]n
insurer is not required to blindly accept conclusory findings
provided by an insured's physician."   <u>Few v. Liberty Mut. Ins.</u>
<u>Co.</u>, 2009 DNH 027, 28 (citing <u>Brigham v. Sun Life of Can.</u>, 317
F.3d 72, 84 (1st Cir. 2003)).

     In her motion for judgment, Prince quotes extensively from
the portions of her medical records where her doctors recorded
what <u>she</u> told them about her symptoms and how they were affecting
her (e.g., "Her pain is ongoing, and, by the patient's report,
quite debilitating").   But a patient's subjective claims of
disability do not acquire objectivity or independence merely by
virtue of being transcribed in a doctor's note.   Of course, the
reason that Prince has to rely so heavily on her self-reporting

---

     [14]This is particularly true of Dr. Guiry, who advised Prince
to return to work in mid-November 2002 but then, apparently at
Prince's urging, reported to Aetna in early December 2002 that
Prince was disabled, without even having seen Prince in the
interim.

is because, as the defendants rightly observed in denying her claim, the record offers little else.  That lack of evidence counts against Prince here, since "it is [her] responsibility to prove [her] claim."  Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 (1st Cir. 2007); see also Cusson, 592 F.3d at 227 ("it was not inappropriate for [the claims administrator in a fibromyalgia case] to rely on the lack of . . . documented evidence"); Brigham, 317 F.3d at 85 (not arbitrary to demand objective evidence "in addition to [a] doctor's inconsistent or unexplained conclusions").

At the very least, the record here is "capable of supporting competing inferences as to the extent of the plaintiff's ability to work."  Leahy, 315 F.3d at 18-19.  This court need not decide which of those inferences it finds more persuasive.  "[U]nder the applicable standard of review, the question is not which side [this court] believe[s] is right, but whether the insurer had substantial evidentiary grounds for a reasonable decision in its favor."  Matias-Correa v. Pfizer, Inc., 345 F.3d 7, 12 (1st Cir. 2003).  The defendants had a substantial basis for denying Prince's disability claim on this record.  Even taking into account Verizon's structural conflict, see supra Part I, the defendants did not abuse their discretion.  This court therefore upholds the denial of Prince's disability claim and grants judgment to the defendants.  See Medina, 588 F.3d at 46 ("in the

presence of conflicting evidence, it is entirely appropriate for a reviewing court to uphold the decision of the entity entitled to exercise its discretion").

In light of that decision, Prince's request for attorney's fees and costs is also denied.  ERISA provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).  "Naturally, such awards are normally for the prevailing party, if at all, and are based on rather general considerations such as fault, ability to pay, deterrence, and the like."  Doe v. Travelers Ins. Co., 167 F.3d 53, 61 (1st Cir. 1999); see also Medina, 588 F.3d at 49. Prince has not shown that any of those considerations favor a departure from the normal practice here.


**V.   Conclusion**

For the reasons set forth above, the defendants' motion for judgment on the administrative record[15] is GRANTED, and the plaintiff's motion for judgment on the administrative record[16] is DENIED.  The clerk shall enter judgment accordingly and close the case.

---

[15]Document no. 22.

[16]Document no. 19.

34

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Dated:     March 16, 2010

cc:  Jared P. O'Connor, Esq.
     William D. Pandolph, Esq.